635 S.E.2d 87

**In the Matter of Walter H. SMITH, Respondent.**

**No. 26206.**

Supreme Court of South Carolina.

Submitted June 26, 2006.

Decided Aug. 28, 2006.

344

Henry B. Richardson, Jr., Disciplinary Counsel, of Columbia, for Office of Disciplinary Counsel.

Michael G. Sullivan; A. Camden Lewis and Peter D. Protopapas of Lewis & Babcock, LLP, all of Columbia, for respondent.

PER CURIAM.

In this attorney disciplinary matter, respondent and the Office of Disciplinary Counsel (ODC) have entered into an Amended Agreement for Discipline by Consent (Agreement) pursuant to Rule 21, RLDE, Rule 413, SCACR. In the Agreement, respondent admits misconduct and consents to a definite suspension not to exceed two years or an indefinite suspension. We accept the Agreement and indefinitely suspend respondent from the practice of law in this state. The facts, as set forth in the Agreement, are as follows.

## FACTS

### Matter I

Respondent was admitted to the practice of law in 1981. He is a sole practitioner in Columbia. Prior to being placed on interim suspension, respondent devoted approximately 75% of his time to the practice of domestic law, 10% of his time to the practice of real estate law, and the remaining 15% of his time to other miscellaneous aspects of the law.

In furtherance of his real estate practice, respondent entered into an arrangement with State Title, a corporation, in or around 1988, working principally through Stella Kelly, the owner, manager, and principal employee of the corporation, but also on occasion with Lauren Proctor (Kelly's daughter) who was an employee of State Title. Neither Kelly nor Proctor were licensed to practice law and, during the period of the arrangement, there were no licensed lawyers employed by or working within the offices of State Title. State Title maintained an office separately from respondent's law office. Respondent had no interest in or position with State Title at any time.

The purpose of the arrangement between respondent and State Title was to have State Title provide real estate closing services to respondent and/or his law firm. The arrangement remained in effect from approximately 1988 until respondent discovered significant shortages in his trust account in June 2005. The following is a description of the parties' arrangement:

1.   Respondent opened and maintained an IOLTA trust account with banks in his name and/or in the name of his law firm.

2.   The IOLTA account was originally opened with BB & T and then with South Trust Bank, which merged with and is now known as Wachovia.

3.   Cancelled checks, bank statements, and other communications between the banks where the IOLTA accounts were maintained were sent to respondent's office, opened, and reviewed by respondent, however the communications were not as closely and carefully reviewed by respondent as he now recognizes they should have been.

4.   Respondent caused Kelly to be a signatory on the IOLTA accounts.

5.   Kelly was a licensed title insurance agent and State Title was a licensed title insurance agency for Atlantic Title Insurance Company (Atlantic Title); respondent was approved to close real estate transactions where Atlantic Title was issuing title insurance.

6.   Atlantic Title was the principal, if not exclusive, title insurance company utilized under the arrangement between State Title and respondent.

7.   On approximately a monthly basis, the bank statements and cancelled checks that had been received and opened by respondent were picked up from respondent's law office by a representative of State Title, carried to the offices of State Title and, for the most part, thereafter maintained at the offices of State Title until termination of the arrangement in 2005.

8.   The bank statements, cancelled checks, checkbook(s) and deposit book(s) for the IOLTA accounts were, for the most part, maintained at the offices of State Title, but respondent had a checkbook and some bank records at his office.

9.   In connection with respondent's real estate closings handled by State Title, State Title would cause a title examination to be conducted and an abstract to be prepared, would prepare closing documents, deliver closing document to respondent's law office, pick up executed closing docu-

ments after closing, and draft checks on the IOLTA accounts for disbursement of the proceeds.

10. Proceeds related to the closings were wired or deposited into the IOLTA accounts for use by State Title in making disbursements from closings conducted by respondent.

11. Respondent reviewed all the closing documents prior to the closings.

12. The closings were generally, if not always, at respondent's office. Respondent attended all closings of the real estate transactions handled under the arrangement.

13. After the closings, the executed closing documents and any proceeds related thereto and not already deposited into the IOLTA accounts would be taken back to the offices of State Title by an officer, agent, or employee of State Title and left in possession of State Title.

14. State Title handled the recordation of documents from closings without supervision by or involvement of respondent.

15. State Title would make disbursements from respondent's IOLTA accounts under Kelly's signature without supervision by respondent.

16. Respondent's involvement in the closings ended when clients left his office and, thereafter, recordation, disbursement of proceeds, and other actions needed to complete the transactions were handled by non-lawyer personnel of State Title without supervision of respondent, to include but not limited to, correspondence with payees, lenders, and clients, payment of real property taxes on subject property, recordation of documents, payoffs of prior liens, and the like.

17. For the most part, respondent had no meaningful involvement in the handling of the transactions after the clients left his law office (unless some impediment to the closing was reported to respondent) and monies and documents connected therewith were left to a non-lawyer representative of State Title for completion of the transactions.

18. When respondent became aware of problems related to any of the closings, the problems were generally referred to State Title for remediation.

19. Respondent did not reconcile or thoroughly inspect the records of his IOLTA accounts until severe shortages appeared in 2005.

20. No or virtually no monthly reconciliations of the IOLTA accounts were made by respondent; however respondent represents he thought Kelly was making a monthly reconciliation of the accounts and respondent relied on her to do so.

21. In fact, Kelly did some type of reconciliations or recordkeeping in writing which respondent viewed, but it is now recognizes that her reconciliations were inaccurate, incomplete, and did not come close to meeting the requirements imposed by Rule 417, SCACR.

22. Respondent closed numerous real estate transactions utilizing the services of State Title.[1]

23. During the period of the arrangement, most client files related to the closings were maintained at the office of State Title.

24. State Title would pay or absorb any charges or assessments to the bank accounts for any insufficient funds or "NSF" checks.

25. The IOLTA accounts were only to be used by State Title for transactions where respondent was the closing attorney.

Respondent now recognizes and acknowledges that there were dramatic and glaring "red flags" evidencing that proceeds of the real estate closings were not being safely kept. These red flags include the following insufficient funds notices and assessments to the IOLTA accounts: 1) twenty-two insufficient funds checks with assessments of $526 in 2000; 2) fifteen insufficient funds checks with assessments of $392 in 2001; 3) twenty-two insufficient funds checks with assessments of $616 in 2002; 4) three insufficient funds checks with assessments of $90 in 2003; 5) forty-four insufficient funds checks with assessments of $1,320 in 2004; 6) for a portion of 2005 (until respondent ended the arrangement with State Title), there were thirty-four insufficient funds checks of $1,020; 7) in August 2004 alone, $900 was assessed against the

---

1. After this matter was brought to its attention, Atlantic Title was given possession of approximately 1400 of respondent's files for review.

IOLTA accounts for insufficient funds; and 8) in January 2005 alone, $600 was assessed against the IOLTA accounts for insufficient funds.

In addition to the insufficient fund charges assessed against the IOLTA accounts, there were other red flags on the bank statements and cancelled checks which indicated the accounts were not being properly handled by State Title. For example:

1. Numerous checks totaling $40,603 were written on the accounts payable to the order of or for the benefit of Debbie Mitchell (the roommate, companion, and/or close friend of Kelly's daughter, Lauren Proctor). These checks were not written, signed, or authorized by respondent.

2. Numerous checks totaling approximately $151,476 made payable to South Trust Bank and drawn on the accounts bore no relation to any real estate transactions closed by respondent. It is now known that there were monthly payments made on an equity loan for Mitchell. These checks were not written, signed, or authorized by respondent.

3. Five checks payable to South Carolina Electric and Gas and one check payable to Time Warner Cable were written on the IOLTA accounts and bore no known relationship to any real estate closings handled by respondent.

4) During the period of the arrangement, one check was signed by Mitchell (who was not even a signatory on the IOLTA accounts). This check was not written, signed, or authorized by respondent.

Notwithstanding the numerous assessments to the IOLTA accounts, checks written to payees unrelated to real estate closings, and a check signed by a person who was not a signatory to the accounts, respondent continued his arrangement with State Title. In addition, he allowed State Title to have access to and control over the IOLTA accounts.

During the period of the arrangement, Kelly became critically ill for several months and unable to come to the office of State Title on her regular schedule. Kelly's daughter, Proctor, carried on the business of State Title on her mother's behalf. Respondent was aware of Kelly's serious illness and that, for a period of several months, Proctor was operating State Title and providing services to respondent under the terms of the arrangement. During Kelly's absence from State

Title, Proctor brought prepared documents to respondent's law office and then carried executed documents back to State Title after each closing at respondent's office. Proctor signed Kelly's name to checks drawn on the IOLTA accounts.

It is now known that, in August 2004, there was a deposit of $50,000 into an IOLTA account from Nancy Abernathy and, thereafter, a check drawn out of the account payable to Nancy Abernathy for the same amount. The deposit and withdrawal had no relationship to any client files handled by respondent. Respondent did not participate in the Abernathy transaction. The parties believe the transaction was arranged by someone at State Title to conceal shortages and/or other irregularities in the IOLTA account. Had respondent closely reviewed the cancelled checks and bank statements, he would have recognized the account was being used by State Title for inappropriate purposes unrelated to the arrangement and recognized that there were unacceptable and inappropriate shortages in the account.

It is now known that on September 30, 2004, Joan T. Sammons (Kelly's sister) borrowed money on real estate and made a $50,000 deposit into respondent's IOLTA account, presumably to cure shortages in the account and as an accommodation to Kelly. The funds deposited in the account are now missing and Sammons' mortgage is outstanding and unpaid.

Respondent did not participate in Sammons' closing and it appears that someone forged respondent's name without his consent or knowledge to at least one of the closing documents in that transaction. Had respondent closely examined the cancelled checks and bank records, he would have recognized the IOLTA account was being used by someone for inappropriate purposes unrelated to his arrangement with State Title.

On or about April 1, 2005, respondent learned from Kelly that there was an unexplained shortage in the IOLTA account in the approximate amount of $60,000. Respondent promptly deposited $60,000 of his own funds into the account to compensate for the shortage and directed Kelly to determine and report the cause of the shortage to him. Kelly later reported to respondent that she had discovered the source of the shortage was a previously non-received wire transfer or non-

deposited check that had been received and/or located and deposited into the account, thereby curing the reported shortage.[2] Respondent relied on the representation from Kelly. On or about April 25, 2005, respondent withdrew $60,000 from the account and deposited the amount into his personal funds and/or the firm's operating account. However, respondent did not independently verify Kelly's representations as to the cause of the shortage and that the $60,000 deposit had in fact cured the reported shortages.[3]

On April 8, 2005, after respondent's deposit of $60,000 into the account, two insufficient fund checks were issued on the account. On May 24, 2005 (after respondent's withdrawal) and again on May 25, 2005, two more insufficient funds checks were written against the account.[4] The assessments for the insufficient funds checks were reported on the monthly bank statements sent by the bank to respondent. It now appears that at least a portion of the $60,000 withdrawn by respondent from the account on April 25, 2005 was from monies of others, albeit unknown to respondent on the occasion of the withdrawal.

On June 15, 2005, respondent received a telephone call from Wachovia and was advised a deposit of $195,000 was necessary in order to make good checks drawn on the IOLTA account. The same day respondent raised the sum of $195,000 from his own personal funds and those of his family and made a deposit into the account.

Respondent contacted forensic Certified Public Accountant Roger Long to assist him in determining the source of the shortages in the account. Respondent and Long worked at the offices of State Title from June 17 through 19, 2005, reviewing the files and bank records to determine the nature and source of the shortages. The review indicated significant

---

2. On April 1, the bank records indicated that there had been a check returned for insufficient funds.

3. Neither respondent, his CPA, nor ODC have been able to locate any non-received wire transfer or non-deposited check and it now appears to the parties that Kelly's representations concerning the cause of the shortage were false.

4. While the four checks were honored by the bank, an assessment was charged against the account for each check.

shortages in the account and other irregularities in the handling of respondent's real estate closings by State Title.

On June 20, 2005, respondent contacted an attorney. The same day, the attorney and respondent met with respondent's CPA and ODC. That day, respondent made a self-report of what had been learned since June 16, 2005 and he notified Atlantic Title of the shortages and problems which had been reported to ODC.

It now appears that, over an extended period of time, someone (not respondent) misappropriated money belonging to respondent's clients and third parties from respondent's IOLTA accounts in excess of $838,916. This amount has been reduced to approximately $643,916 due to respondent's deposit of $195,000 into the account.

Further, it now appears that, in addition to claims regarding missing funds, State Title was not handling closings properly for respondent. The improper closings include, but are not necessarily limited to, the following claims: [5]

1. seven unpaid mortgages notwithstanding the funds to pay off the mortgages were collected and deposited into the IOTLA account at closing;

2. five mortgages were not recorded after closing;

3. two mortgages which were paid off were not satisfied by record;

4. two deeds were not recorded;

5. approximately twenty-eight documents had not been transmitted for recordation in a timely fashion or, in some cases, not transmitted for recordation at all;

6. two cases of unpaid real property taxes where funds for the payment thereof had been deposited in the IOLTA account at closing for the payment of those taxes;

7. six cases of other unpaid bills not being paid where funds for their payment were collected and deposited into the IOLTA account at closing;

8. one parcel of real estate subject to a closing handled by respondent with the assistance of State Title is subject to an ongoing foreclosure action because the prior lien was not

---

5. As set forth below, some of these claims have been remediated.

paid off after closing, notwithstanding that the sum of $213,903 was deposited into the IOLTA account for that purpose; and

9. Flagstar Bank funded a real estate transaction closed by respondent where the first lien on the subject property was not paid off (although the sum of $192,292 was deposited into respondent's IOLTA account for the purpose of paying the lien), leaving Flagstar Bank in a subordinate position rather than as the superior lien holder as contemplated by both the closing instructions and the closing documents; Atlantic Title and respondent have been named as defendants in a civil action brought by Flagstar Bank.

As the title insurance carrier for respondent in the real estate transactions closed under his arrangement with State Title and because of the shortages in respondent's IOLTA account, Atlantic Title reports as follows:

1. as of November 14, 2005, Atlantic Title paid out approximately $350,000 towards claims made against it;

2. additional claims pending against Atlantic Title (which it reports it will likely pay) exist in the amount of approximately $201,304;

3. Atlantic Title has lost $14,441.62 in its share of premiums for title insurance issued by State Title in connection with the closings handled by respondent;

4. respondent has $500,000 in Errors and Omissions coverage; the payments made by and projected losses to Atlantic Title alone are approximately $565,475, plus attorney's fees and costs; respondent's Errors and Omissions carrier has denied coverage for the losses and claims; and

5. Atlantic Title discovered problems with real estate closings conducted by respondent and unrelated to Atlantic Title.

## Matter II

In November 2004, respondent closed a real estate transaction for Complainant A. In April 2005, Complainant A discovered that the real property taxes had not been paid and, further, that the deed had not been recorded. In his Response to Disciplinary Counsel dated May 5, 2005 (made after respondent had deposited the $60,000 in the account), respon-

dent made no mention of the shortages. He further stated that, in response to an allegation of lack of response to communications from Complainant A, that the situation was "... like repeatedly pushing an elevator button will not bring the elevator any faster. [That] the money remained in escrow and was not applied to any other purpose."

Respondent represents he relied on Kelly in drafting his Response to Disciplinary Counsel and it now appears that the money had been applied by someone at State Title for purposes other than intended, albeit unknown to respondent at the time he filed his Response to Disciplinary Counsel. The taxes have now been paid on behalf of Complainant A and the deed has now been recorded.

### Matter III

Complainant B alleges that a real estate transaction was closed by respondent in October 2004, but that her deed to the property had not been recorded as of April 2005 and a tax execution had been issued against the property notwithstanding that funds had been withheld by respondent at closing to pay the real estate taxes. In his Response to Disciplinary Counsel dated May 20, 2005, (after his deposit of $60,000 into the IOLTA account) respondent blamed the problems on the Clerk of Court and stated, "the money collected for taxes never left my escrow account and the Complainant's property was never at risk." Respondent made no mention in his response about the shortages he knew existed in the account. As part of his Response to Disciplinary Counsel, respondent submitted a statement from Kelly in which she took responsibility for the shortcomings and claimed they were due to her inability to obtain qualified staff during her illness.

Respondent represents he relied on Kelly in drafting his Response to Disciplinary Counsel and, based on information later learned through an audit, he recognizes that, due to the account shortages and the fact that Complainant B's property was subject to a tax execution due to failure to pay property taxes withheld at closing, Complainant B's property is now known to have "been at risk" contrary to his earlier representations. The real property taxes on the subject property have now been paid and the deed has now been recorded.

## Matter IV

Complainant C alleges respondent closed a real estate transaction but failed to pay off a prior lien in a timely fashion. In his Response to Disciplinary Counsel dated May 20, 2005, respondent represented that replacement checks were issued on January 22, 2005 (for checks that should have been issued on January 14, 2005). The bank records, however, do not indicate that the earlier checks had been issued.

Once again, respondent did not mention the shortages in the IOLTA account which were known to him. He relied on the assistance of and/or information from Kelly in drafting his Response to Disciplinary Counsel. After an audit, respondent recognizes that representations made in the Response to Disciplinary Counsel were incomplete and, in some parts, incorrect. The refinanced mortgage has been paid off.

## Matter V

Complainant D alleges that respondent closed a loan transaction for her on March 31, 2005, but the payoff of the $96,509.89 first lien was not received by the lender until approximately two months later.

## Matter VI

Complainants Seller and Buyers allege respondent closed a real estate transaction but the payoff of the first mortgage lien reflected on the closing statement in the amount of $209,988.30 was not made by respondent. The failure resulted in a foreclosure action against the Seller and Buyers. The Seller's mortgage has now been paid off, the foreclosure action dismissed, and the related civil suit against respondent dismissed.

## Matter VII

Respondent closed a real estate transaction for Complainant E on or about April 20, 2005, but failed to pay off the first mortgage lien in the amount of $120,292.44. As a result, the lender filed litigation against Atlantic Title.

On June 15, 2005, respondent's IOLTA account had a negative balance of $192,059, indicating funds to pay off the mortgage had been misappropriated. The first mortgage has

now been satisfied and a related civil action against respondent has been dismissed.

## Matter VIII

On behalf of certain borrowers, $28,475 in cash or its equivalent was deposited into respondent's IOLTA account in connection with a scheduled real estate matter to be handled by respondent. The funds were misappropriated and have not been located.

In summary, after credit is given for amounts paid into the IOLTA account by respondent, there are estimated shortages of approximately $643,916. ODC does not contend respondent misappropriated the funds or knew of or condoned the misappropriation by others. However, ODC asserts, and respondent concedes, that the shortages and other problems which have come to light after June 16, 2005 would not have occurred (or at least would not have occurred to their current magnitude) had respondent strictly followed the published directives of this Court and been more alert to the red flags mentioned herein.

Since discovering the shortages and making a self-report, respondent has fully cooperated with ODC in connection with these matters. Respondent has no prior disciplinary history.

## LAW

■ Respondent admits that, by his misconduct, he has violated the following provisions of the Rules of Professional Conduct, Rule 407, SCACR: Rule 1.1 (lawyer shall provide competent representation); Rule 1.3 (lawyer shall act with reasonable diligence and promptness in representing clients); Rule 1.4 (lawyer shall keep clients informed about status of a matter); Rule 1.15 (lawyer shall promptly deliver to client any funds or other property to which client is entitled and lawyer shall keep client funds separate from his own funds); Rule 5.3 (lawyer is responsible for conduct of non-lawyer assistants); Rule 5.5 (lawyer shall not assist person who is not a member of the Bar in performance of activity that constitutes the unauthorized practice of law); Rule 8.4(a) (lawyer shall not violate Rules of Professional Conduct); and Rule 8.4(e) (lawyer shall not engage in conduct that is prejudicial to administration of justice). Respondent agrees his recordkeeping and

money handling procedures also violated Rule 417, SCACR. In addition, respondent admits his misconduct constitutes a violation of Rule 7, RLDE, of Rule 413, SCACR, specifically Rule 7(a)(1) (lawyer shall not violate Rules of Professional Conduct or any other rules of this jurisdiction regarding professional conduct of lawyers).

## CONCLUSION

We accept the Agreement for Discipline by Consent and indefinitely suspend respondent from the practice of law. The Court denies respondent's request that the suspension run retroactively to the date of his interim suspension.[6] Within fifteen days of the date of this opinion, respondent shall surrender his certificate of admission to practice law in this state to the Clerk of Court and shall file an affidavit with the Clerk of Court showing that he has complied with Rule 30, RLDE, Rule 413, SCACR.

Respondent shall not be reinstated until he has provided proof that he has paid full restitution to all persons and entities who have been harmed by his misconduct, including clients, banks, the Lawyers' Fund for Client Protection, and any others.

**INDEFINITE SUSPENSION.**

TOAL, C.J., MOORE, WALLER and BURNETT, JJ., concur.

PLEICONES, J., not participating.

---

6. On November 9, 2005, respondent was placed on interim suspension. *In the Matter of Smith*, 366 S.C. 339, 622 S.E.2d 526 (2005).